|  |  |  |
|---|---|---|
| *Ruifang Hu,* | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 18-cv-1240 (TSC) |
| | ) | |
| *K4 Solutions, Inc., and RightDirection* | ) | |
| *Technology Solutions LLC,* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff Ruifang Hu has sued her former employers, K4 Solutions, Inc. ("K4") and

RightDirection Technology Solutions LLC ("RDTS"), alleging violations of numerous federal

and D.C. employment laws.  Defendants jointly move to dismiss the Amended Complaint for

failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  (ECF No. 13 ("Def.

Br.").)  RDTS separately moves to dismiss under Rule 12(b)(6) on the ground that it was not

Hu's joint employer.  (ECF No. 17 ("RDTS Br.").)

Hu brings eight claims against both Defendants: wrongful discharge in violation of D.C.

public policy (Count I); race discrimination and retaliation in violation of 42 U.S.C. § 1981

(Counts V and VI); sex, race, and national origin discrimination and retaliation in violation of the

District of Columbia Human Rights Act, D.C. Code § 2-1402.11 ("DCHRA") (Count VII);

violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1) *et seq.* (Count VIII); defamation (Count

IX); violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA") (Count X), and;

violation of the D.C. Accrued Sick and Safe Leave Act, D.C. Code § 32-531-02 ("D.C. Leave

Act") (Count XI).

Hu also brings three claims against K4 alone: race, sex, and national origin discrimination, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII") (Counts II, III, and IV).

Having reviewed the parties' submissions, the court will DENY in part and GRANT in part Defendants' motion to dismiss and DENY RDTS's motion to dismiss.

## I.    BACKGROUND

The U.S. Customs and Border Protection ("CBP") administers an Electronic Visa Update System Call Center ("Call Center") for certain visa holders to manage their biographic information. (ECF No. 10 ("Am. Compl.") ¶¶ 7–8.) CBP contracted with K4 and RDTS to manage the Call Center. (*Id.* ¶¶ 5–8.) Hu, a woman of Chinese descent and national origin, worked as a customer service representative at the Call Center from August 2016 until March 2017. (*Id.* ¶ 4.) Hu claims she was an exemplary employee during her short tenure at the Call Center, and K4 gave her a certificate of appreciation for her performance. (*Id.* ¶¶ 18–20.) While K4 hired Hu, both K4 and RDTS managed the Call Center and supervised her. (*Id.* ¶¶ 4, 9.)

Shortly after she began work at the Call Center, Hu interviewed for a supervisor position. (*Id.* ¶¶ 11–12.) Her interviewer told her she was the best candidate and congratulated her on being offered the position. (*Id.* ¶ 13.) That offer, however, was "immediately revoked" by K4's Vice President, Marlene Duvall, because Hu "failed to speak more like an American." (*Id.* ¶ 13.) Duvall later purportedly told others she "preferred a white male" for the position. (*Id.*) K4 then consecutively hired two less qualified white men for the supervisor position. (*Id.* ¶¶ 14–15.) Each was quickly fired, one for not meeting the job requirements and the other because CBP complained he lacked the necessary Chinese language skills for the position. (*Id.*) K4 then promoted Abigail Johnson, a woman of Chinese descent, for the supervisor position in December

2016.  (*Id.* ¶ 21.)  While Johnson had only worked at K4 for two weeks and was less qualified than Hu, Duvall allegedly promoted Johnson because she could "speak more like an American" and had married a white man.  (*Id.* ¶¶ 21–22.)  Hu was denied the opportunity to apply for promotion to supervisor again because Defendants did not post the vacancy.  (*Id.* ¶ 22.)

In January 2017, RDTS created a new manager position at the Call Center and hired Alice Yeh, who had no prior experience.  (*Id.* ¶¶ 37–38.)  Yeh is a woman of Taiwanese descent, who was raised in the United States.  (*Id.* ¶ 38.)  Hu did not apply for the position because Defendants did not post it.  (*Id.* ¶¶ 37–38.)

Hu then clashed with her direct supervisor, Johnson, who told Hu she did not "belong here and should leave," stood behind her chair "frequently observing her stance and manner," "kept notes on her whereabouts and work," questioned CBP officers about her assignments, commented on her conversations and activities, "spied" on her emails, and gave her worse shifts and fewer hours.  (Am. Compl. ¶¶ 24–25, 27–28.)  Hu complained about Johnson's behavior to Duvall and another K4 Vice President, Bethea, in December 2016.  (*Id.* ¶ 26.)  They "refused to listen" and informed Hu that because Johnson was her superior, Johnson could monitor her.  (*Id.*)  Bethea did, however, direct Hu to follow up with him if she experienced any retaliation.  (*Id.* ¶ 31.)

After her complaint, Defendants gave Hu less desirable shifts and reduced her hours from approximately 40 to 15 each week.  (*Id.* ¶ 28–29.)  Hu claims that Johnson and Duvall also gave preferential treatment to favored employees with whom it was "commonly thought" they had intimate relationships.  (*Id.* ¶¶ 32–35.)  Those preferred employees were given more guidance, no discipline for misconduct, longer and better shifts, and more freedom in scheduling; Hu's

requests for schedule changes were rejected. (*Id.*) Hu again complained to Bethea and Duvall and received no response. (*Id.* ¶ 31.)

Hu also complained to Bethea and Duvall about being paid significantly less than the male customer service representatives and received no response. (*Id.* ¶¶ 31, 108, 109.) Hu and her coworkers also raised the unequal pay issue with K4's President; he rejected their request and told them that the male employee who disclosed his salary should not have done so. (*Id.* ¶¶ 109, 110.)

Finally, Hu made one more complaint regarding how Defendants assisted certain visa holders. Defendants had directed their employees not to assist visa holders who used virtual private network ("VPN") software to submit information to the Call Center in order to circumvent China's internet restrictions. (*Id.* ¶ 39.) On March 17, 2017, Hu emailed Johnson and others and told them that denying assistance to applicants using VPN software unfairly discriminated against Chinese visa holders based on political views and race. (*Id.* ¶¶ 40, 47(a).) Hu also "voiced her objection to discrimination in Defendant's hiring and promotion decisions." (*Id.* ¶ 41.) Defendants fired Hu the next day, when she was to begin medical leave. (*Id.* ¶¶ 42–43.) Yeh telephoned and texted Hu to inform her she was terminated "because her March 17, 2017 emailing was viewed as 'illegal.'" (*Id.* ¶ 42.) Defendants announced Hu's termination to the Call Center office and CBP officers. (*Id.* ¶ 120.)

## II.      LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) for failure to state a claim tests the legal sufficiency of a complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). The court does not assess the truth of what is asserted nor "whether a plaintiff has any evidence to back up what is in the complaint." *Id.* (citation omitted). "To survive a motion to dismiss, a complaint

must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level" and move plaintiff's claims "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555, 570 (2007). Facts that are "merely consistent" with a defendant's liability do not meet the plausibility standard. *Iqbal*, 556 U.S. at 678 (citation omitted).

The court presumes the truth of a plaintiff's factual allegations, *see Iqbal*, 556 U.S. at 679, and construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted). This presumption does not apply, however, to a "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678; *see Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014) (the court "do[es] not accept as true . . . the plaintiff's legal conclusions or inferences that are unsupported by the facts alleged.").

## III.    ANALYSIS

Both Defendants move to dismiss the Amended Complaint, arguing that it fails to state claims on which relief can be granted. RDTS separately moves to dismiss on the ground that it was not Hu's employer.

### A.  **Joint Employer (Counts I, V, VI, VII, VIII, X, XI)**

RDTS argues that Hu has not pleaded that RDTS jointly employed Hu, and therefore Hu cannot state claims against RDTS for wrongful discharge in violation of public policy,

discrimination and retaliation, or wage violations of the Equal Pay Act or FLSA.  (RDTS Br. at 6–9, 11–12.)

1. <u>Wrongful Discharge and Employment Discrimination Claims</u>

To determine whether a plaintiff worked for a joint employer in employment discrimination cases, courts in this Circuit have looked to the test articulated in *NLRB v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1123 (3d Cir. 1982).  *See, e.g.*, *Redd v. Summers*, 232 F.3d 933, 937–38 (D.C. Cir. 2000) (noting that the *Browning-Ferris* test is a "fairly standard formulation" of the joint-employer test).[1]  Under *Browning-Ferris*, two businesses are joint employers when they "share or co-determine those matters governing essential terms and conditions of employment."  *Coles*, 471 F. Supp. at 50 (quoting *Browning-Ferris*, 691 F.2d at 1124).  Whether an alleged joint employer "retain[s] for itself sufficient control" over the "terms and conditions" of the alleged joint employee's employment is "essentially a factual issue."  *Browning-Ferris*, 691 F.2d at 1124.  The key elements of control include the employer's power to "hire and fire," the power to "promulgate work rules and assignments," the power to set the employee's conditions of employment, including "compensation, benefits and work schedules," "involvement in day-to-day supervision" of the employee, and "control of employee records."  *Miles v. Howard Univ.*, 83 F. Supp. 3d 105, 117

---

[1] In *Redd*, the D.C. Circuit used a different test, borrowing the 11-part test from *Spirides v. Reinhardt*, 613 F.2d 826, 831 (D.C. Cir. 1979), to determine whether a plaintiff is an employee or independent contractor.  232 F.3d at 938.  The D.C. Circuit did not hold, however, that the *Spirides* test controls joint-employment questions, and specifically noted that it "doubt[s] whether the *Spirides* test is suited" to joint-employment questions.  *Id.*  Therefore, "reading between the lines" of *Redd*, courts have held that *Browning-Ferris* states the applicable test for joint-employment questions.  *Coles v. Harvey*, 471 F. Supp. 2d 46, 50 (D.D.C. 2007) (citing *Redd*, 232 F.3d at 938).  This court follows suit and applies the *Browning-Ferris* test rather than *Spirides*.

(D.D.C. 2015), *aff'd*, 653 F. App'x 3 (D.C. Cir. 2016) (citing *In re Enter. Rent-A-Car Wage & Hour Emp't Practices Litig.*, 683 F.3d 462, 469 (3d Cir. 2012)) (internal quotation marks omitted).

RDTS argues that Hu fails to plead specific facts about RDTS's power to "control" her conditions of employment. (RDTS Br. at 8–9.) But Hu pleads specific facts to support that RDTS controlled her work schedule, (Am. Compl. ¶¶ 28–29, 35), was involved in day-to-day supervision (*Id.* ¶ 39), had the power to hire and fire (*Id.* ¶¶ 9, 22, 30, 37, 42), and controlled employee records (*Id.* ¶ 44).[2] She further alleges that RDTS and K4 "had supervisory authority over the plaintiff, including the ability to hire, fire, set shifts, and set wages." (*Id.* ¶ 9.) To be sure, Hu alleges some facts specific to K4 alone: that K4 hired her, (*Id.* ¶ 11), that a K4 employee was her direct supervisor (*Id.* ¶¶ 25–27), and that she was terminated "on behalf of K4 and CBP," (*Id.* ¶ 42). But, taken together and viewed in the light most favorable to Hu, her allegations against RDTS establish that it had sufficient control over Hu to survive a motion to dismiss.

---

[2] Hu asks the court to take judicial notice of the facts in the Equal Employment Opportunity Commission ("EEOC") Decision stating that CBP's argument "cites to the EEO Counselor's report which represents that an Agency Supervisory Officer stated that the Staffing Firm 2 Program Manager was responsible for scheduling, approving leave, addressing performance issues, managing, and handling disciplinary issues of contract employees[.]" (ECF No. 21 ("Pl. Opp. to RDTS Mot.") at 11 (quoting *Karleen v. Nielsen*, EEOC Appeal No. 0120173075).) A court may take judicial notice of undisputed facts in the public record, including facts determined in other proceedings. *See Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1228 (D.C. Cir. 1993) (court may look to record of another proceeding "to avoid unnecessary proceedings when an undisputed fact on the public record makes it clear that the plaintiff does not state a claim upon which relief could be granted"). Here, however, the court declines to take judicial notice of the fact repeated in the EEOC Decision because it was only stated in the summary of the agency's argument, was not a fact determined by the EEOC in the Decision, and is squarely and reasonably disputed in this litigation. *See* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute[.]").

2. <u>FLSA and Equal Pay Act Claims</u>

The FLSA and Equal Pay Act define "employer" to "include[ ] any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). In determining whether an entity is an employer under the FLSA, the court looks to the "economic reality" of the employment relationship. *Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 11 (D.C. Cir. 2001). The court examines the totality of the circumstances, including "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.* (quoting *Henthorn v. U.S. Dep't of Navy*, 29 F.3d 682, 684 (D.C. Cir. 1994)). This test has similar elements to the "control" factors considered under *Browning-Ferris*. *Compare Morrison*, 253 F.3d at 11 *with Miles*, 83 F. Supp. 3d at 117 (explaining the elements of control include the employer's power to "hire and fire;" the power to "promulgate work rules and assignments;" the power to set the employee's conditions of employment, including "compensation, benefits and work schedules;" "involvement in day-to-day supervision" of the employee; and "control of employee records"). Therefore, because Hu alleges enough facts to establish that RDTS was her employer for her employment discrimination and retaliation claims, she similarly alleges enough facts to establish that RDTS was her employer for her compensation claims under the FLSA and Equal Pay Act at this stage in the proceeding.

Accordingly, RDTS's motion to dismiss will be denied.

**B. Wrongful Discharge Claim (Count I)**

The tort of wrongful discharge in violation of public policy is a limited exception to the general rule in the District of Columbia that an at-will employee may be discharged "at any time

and for any reason, or for no reason at all." *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 30 (D.C. 1991). Though the cause of action was initially limited only to discharge for refusal to violate the law, the D.C. Court of Appeals expanded the exception in *Carl v. Children's Hosp.*, 702 A.2d 159, 160 (D.C. 1997), holding that a plaintiff can bring a claim for wrongful discharge in violation of public policy if they can point to "some identifiable policy that has been 'officially declared' in a statute or municipal regulation, or in the Constitution," and there is a "close fit between" the policy "and the conduct at issue in the allegedly wrongful termination." *Davis v. Cmty. Alternatives of Washington, D.C., Inc.*, 74 A.3d 707, 709–10 (D.C. 2013) (citing *Carl and Fingerhut v. Children's Nat'l Med. Ctr.*, 738 A.2d 799, 803–04 (D.C. 1999)).

Hu alleges that Defendants fired her the day after she reported racial and political discrimination in their administration of immigration laws under a federal contract.[3] (Am. Compl. ¶ 49.) She claims that Defendants' instructions to employees resulted in "selective[] enforce[ment] of the law based on visa holders' race, expressed opinions, or political affiliation." (*Id.* ¶ 47(a).) Hu further alleges that the Defendants' discriminatory practices led to hiring employees with inadequate Chinese language skills, which caused "problematic VPN comprehension[] and imperiled impartiality in the administration of immigration law." (*Id.* ¶ 47(b).) She claims Defendants wrongfully terminated her in violation of the public policy of

---

[3] Hu cannot base her claim for wrongful termination in violation of public policy on her reporting discrimination against herself. *Kassem v. Wash. Hosp. Ctr.*, 513 F.3d 251, 254 (D.C. Cir. 2008) (citing *Nolting v. Nat'l Capital Grp.*, 621 A.2d 1387, 1390 (D.C. 1993) (holding a plaintiff with a viable statutory employment discrimination claim cannot seek relief by bringing a claim for wrongful discharge in violation of public policy).

"encouraging reporting of problems in federal programs." (ECF No. 20 ("Pl. Opp. to Def. Mot.") at 19 (citing *Clay v. Howard Univ.*, 128 F. Supp. 3d 22, 28 (D.D.C. 2015)).)[4]

Hu's allegations clear the bar, but barely. Courts in this district have previously found that the District of Columbia has "a clear public policy of encouraging government employees to come forward and report possible problems in federal programs." *Myers v. Alutiiq Int'l Solutions, LLC*, 811 F. Supp. 2d 261, 266 (D.D.C. 2011) (citing 5 U.S.C. § 2302). In *Myers*, the court addressed the public policy, embodied in 5 U.S.C. § 2302, against conflicts of interest in government contracts. That statute also more broadly protects whistleblowers. To show a "close fit," Hu alleges that Defendants fired her the day after she complained that their administration of immigration laws under a federal contract was racially and politically discriminatory. (Am. Compl. ¶ 49.) Hu need not show at this stage that Defendants actually violated a particular statute or regulation in order to invoke the public policy exception, *see Myers*, 811 F. Supp. 2d at 267, and therefore the court finds that Hu has alleged sufficient facts to support a wrongful discharge claim.

Defendants argue that Hu fails to "cite a specific [tenet] of the Constitution or of a statute or regulation" expressing the public policy on which she relies. (Def. Br. at 7.) The pleading standard is not so stringent, however. To state a viable claim for wrongful discharge in violation of public policy, a plaintiff need not point to the specific statute, regulation, or constitutional

---

[4] A plaintiff bringing a claim for wrongful termination in violation of public policy must show a constitutional provision, statute, or regulation for the clear statement of public policy underlying the claim. Hu points to memoranda and directives from the Department of Homeland Security regarding the proper administration of immigration laws. Because the memoranda and directives are not statutes or regulations embodying public policy, *see Williams v. Chugach Alaska Corp.*, 210 F. Supp. 3d 25, 32 (D.D.C. 2016), they cannot be the source of public policy underlying her wrongful termination claim.

provision in their complaint so long as the complaint pleads sufficient facts to otherwise meet the plausibility standard. *MacIntosh v. Bldg. Owners & Managers Ass'n Int'l*, 355 F. Supp. 2d 223, 229 (D.D.C. 2005) (holding that under the federal pleading rules, to state a claim for wrongful termination in violation of D.C. public policy, a plaintiff need not cite the statute or regulation that "embodies a clear mandate of public policy in his complaint"); *see also Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1115 (D.C. Cir. 2000) ("[C]omplaints need not plead law or match facts to every element of a legal theory."). Under the pleading standard, Hu has pleaded enough facts to state a claim for wrongful discharge in violation of District of Columbia public policy encouraging reporting of problems in federal programs.

Accordingly, the court denies the Defendants' motion to dismiss the wrongful discharge in violation of public policy claim (Count I).

## C. Employment Discrimination, Retaliation, and Hostile Work Environment Claims

Hu alleges that RDTS and K4 discriminated and retaliated against her on the basis of her race in violation of 42 U.S.C. § 1981, and on the basis of her sex, race, and national origin in violation of the DCHRA. (Am. Compl. ¶¶ 79–105.) She further alleges that K4 discriminated and retaliated against her because of her sex, race, and national origin, and created a hostile work environment, in violation of Title VII. (*Id.* ¶¶ 53–78.) Title VII, DCHRA, and § 1981 discrimination and retaliation claims are analyzed under the same legal standard. *See McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 6 (D.C. Cir. 2010). Accordingly, the discrimination counts (II, V, and VII) rise and fall together, as do the retaliation counts (IV, VI, and VII).

"Courts in this Circuit 'have consistently recognized the ease with which a plaintiff claiming employment discrimination can survive . . . a motion to dismiss[.]'" *McNair v. District*

*of Columbia*, 213 F. Supp. 3d 81, 86 (D.D.C. 2016) (quoting *Fennell v. AARP*, 770 F. Supp. 2d 118, 127 (D.D.C. 2011)).  A plaintiff need not "plead every fact necessary to establish a prima facie case to survive a motion to dismiss." *Jones v. Air Line Pilots Ass'n, Int'l*, 642 F.3d 1100, 1104 (D.C. Cir. 2011) (citation omitted); *see Farrar v. Wilkie*, No. 18-cv-1585, 2019 WL 3037869, at *2 (D.D.C. July 11, 2019) (citing *Gordon v. U.S. Capitol Police*, 778 F.3d 158, 161–62 (D.C. Cir. 2015)).  Nonetheless, a plaintiff must allege sufficient facts "about 'what . . . [,] who . . . [,] and how' that make such a claim plausible." *Id.* (quoting *Arnold v. Speer*, 251 F. Supp. 3d 269, 273 (D.D.C. 2017) (brackets and ellipses in original); *see Harris v. District of Columbia Water & Sewer Auth.*, 791 F.3d 65, 70 (D.C. Cir. 2015) (explaining that while a plaintiff need not plead a prima facie case on a motion to dismiss, the plaintiff must nonetheless allege facts that if accepted as true would make the discrimination claims plausible).

     1.  <u>Discrimination Claims (Counts II, V, & VII)</u>

Title VII and the DCHRA prohibit discriminatory employment practices based on an employee's race, sex, or national origin.  42 U.S.C. § 2000e–2(a); D.C. Code § 2–1402.11. Section 1981 bars private employers from discriminating on the basis of race with respect to the "benefits, privileges, terms, and conditions" of employment.  42 U.S.C. § 1981.  To state a discrimination claim, a plaintiff need only plead that she "suffered an adverse employment action" because of her "race, color, religion, sex [or] national origin." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).

Defendants argue that Hu fails to allege a prima facie case of discrimination for failure to promote because she does not claim that she was qualified for the position or that a person outside her protected class filled the position.  (Def. Br. at 17–18.)  But, as the D.C. Circuit has explained, a plaintiff need not "make out a prima facie case of discrimination in [her] complaint,

specifically point to similarly situated employees who were given preferential treatment over [her] or offer evidence to demonstrate that [the defendant's] reasons for firing [her] were pretextual." *Sparrow*, 216 F.3d at 1114 (internal quotation omitted). Hu alleges the basic elements of a race, national origin, and sex discrimination claim—that Defendants failed to promote her, and terminated her because of their preferences for white males and people who act and speak "more American" than she does. (Am. Compl. ¶¶ 13, 41, 58.) Hu also alleges she was blocked from further promotions because neither the supervisor nor manager positions were posted, and both were given to other, less qualified candidates. (*Id.* ¶¶ 21–23, 37–38, 59.) Finally, Hu claims she was fired after raising concerns about discrimination in Defendants' hiring and promotion practices. (*Id.* ¶ 41.) These allegations satisfy the pleading standard for discrimination claims. *See McNair*, 213 F. Supp. 3d at 86–87.

Defendants argue that Hu's failure to get the promotion to supervisor in September 2016 was not an adverse employment action because the offer was "immediately revoked." They contend that because the offer was revoked, Hu "could not have received public recognition" of it or suffered "the embarrassment" of being demoted. (Def. Br. at 16.)

Defendants' arguments are unavailing. An "adverse employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). There is no requirement that the plaintiff suffer embarrassment or humiliation. Hu alleges that K4 denied her promotion to supervisor, after initially making an offer, because she did not "speak more like an American" and the supervisor expressed a

preference for white males.  (Am. Compl. ¶ 13.)  This is enough to state an adverse employment action.  (*Id.*)

Defendants also argue that their failures to promote Hu to manager or supervisor later in the year were not adverse employment actions because Hu does not claim she applied for or was denied the positions.  (Def. Br. at 16.)  Again, Defendants' arguments are premised on an incorrect pleading standard.  To state a claim for discriminatory non-promotion, a plaintiff must plead that she applied for and was denied a promotion.  *See Lathram v. Snow*, 336 F.3d 1085, 1089 (D.C. Cir. 2003).  But where it would be futile to apply for a position because of a discriminatory policy, a plaintiff need not allege she applied for the job at all.  *See id.* (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365 (1977)).  Hu claims that after she applied for the supervisor promotion the first time, Duvall revealed that she wanted candidates who "spoke more like an American" and that she preferred white male candidates.  (Am. Compl. ¶ 13.)  K4 then hired two white men for supervisor positions, and then promoted Johnson, a woman of Chinese descent, to the position without posting a vacancy for it.  (*Id.* ¶¶ 14, 15, 22.)  Hu also claims that RDTS did not post a vacancy for the manager position.  (*Id.* ¶ 37–38.)  Taken together, these allegations are enough to make out an adverse employment action claim, even though Hu did not apply for all of the positions, because she pleads that Defendants' practices in publishing vacancies, responding to inquiries, and its history of hiring white men for the positions were discriminatory.  *See Prince v. Rice*, 453 F. Supp. 2d 14, 28 (D.D.C. 2006) (holding plaintiff stated a claim for failure to promote, despite not having applied for the position, because her "failure to apply [wa]s presumably a function of the alleged discrimination").

Accordingly, the court will deny Defendants' motion to dismiss the discrimination claims under Title VII, DCHRA, and § 1981 (Counts II, V, & VII).

    2.  <u>Retaliation Claims (Counts IV, VI, & VII)</u>

Title VII, the DCHRA, and § 1981 likewise prohibit employers from retaliating against employees who oppose unlawfully discriminatory practices. 42 U.S.C. § 2000e–3(a); D.C. Code § 2-1402.61; *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 578 (D.C. Cir. 2013) (finding retaliation claims cognizable under 42 U.S.C. § 1981). To state a retaliation claim, a plaintiff must plead that she engaged in statutorily protected activity and suffered adverse treatment because of her protected activity. *Winston v. Clough*, 712 F. Supp. 2d 1, 11 (D.D.C. 2010) (citing *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007)); *see also Rochon v. Gonzales*, 438 F.3d 1211, 1220 (D.C. Cir. 2006) ("[I]n order to survive a motion to dismiss, all the complaint has to say is [my employer] retaliated against me because I engaged in protected activity." (internal quotation and citation omitted)).

Hu claims she first engaged in statutorily protected activity in December 2016 when she told K4 Vice Presidents Duvall and Bethea that Johnson was harassing her. (Am. Compl. ¶ 26.) Hu alleges that Johnson knew that she was less qualified than Hu, and that she told Hu that "she did not belong here and should leave." (*Id.* ¶ 24.) Hu also claims Johnson kept close watch on her work, assignments, conversations, emails, and comings and goings, and that she reported this conduct as harassment to Duvall and Bethea. (*Id.* ¶ 25–26.) But Hu does not allege that she reported that the harassment was discriminatory, which is a requirement for her report to constitute protected activity. *See Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006) (explaining that for an exchange to constitute "protected activity" the employee must "in some way allege unlawful discrimination"). Therefore, Hu's complaint to her superiors about Johnson

in December 2016 does not constitute protected activity, and the alleged adverse employment actions that are causally related to this report—additional harassment, reduction in hours, and unequal pay—are not actionable as retaliation claims.

Hu alleges two other instances of protected activity: her complaint in January 2017 about unequal pay, (Am. Compl. ¶ 31, 74), and her email on March 17, 2017, about discriminatory hiring practices, (*Id.* ¶¶ 41, 74). Defendants do not dispute that these acts are protected activity.

Hu claims that Defendants retaliated against her by not promoting her to supervisor or manager, but she does not—and cannot—show that the failure to promote her was connected to her protected activity. (*Id.* ¶ 75.) While temporal proximity between protected activity and adverse employment action can support an inference of retaliation, *Winston*, 712 F. Supp. 2d at 11 (citing *Iweala v. Operational Techs. Servs.*, 634 F. Supp. 2d 73, 83 (D.D.C. 2009)), Hu was not promoted to supervisor in September, October, and December 2016—*before* she engaged in any protected activity. And, while she was denied the manager position in January 2017, the same month she reported K4's discriminatory practices, she does not claim that K4 failed to promote her because of her report, nor does she claim the two events were so closely connected that they raise an inference of retaliation. Thus, she has not alleged a causal connection between her non-promotion and her 2017 protected activity, and the non-promotions are not actionable as retaliation claims.

Hu also claims that Defendants took adverse employment action against her by creating the impression she would resign. (Am. Compl. ¶ 75.) Defendants did not address this argument, so the court will accept, for now, that Hu alleges both elements. *See McNair*, 213 F. Supp. 3d at 87, n.2 ("Because Defendant does not contend that the refusal to permit an employee to work

from home is not, in fact, an adverse employment action, the court will accept only for purposes of this opinion that it is an adverse employment action.")

Finally, Hu claims Defendants retaliated by firing her. Defendants argue that Hu has not pleaded a causal connection because she "conspicuously fails to allege the time frame during which she purportedly made complaints to K4 regarding discrimination." (Def. Br. at 24.) But Hu states she sent an email on March 17, 2017, detailing Defendants' allegedly discriminatory conduct in hiring and promotion, and was promptly fired the next day. (Am. Compl. ¶¶ 40–42.) This timing establishes the necessary causal connection to survive a motion to dismiss. *See Patterson v. Johnson*, 505 F.3d 1296, 1299 (D.C. Cir. 2007) (finding temporal proximity could support finding of a causal link where employer transferred the employee the day after he received official notice of a discrimination complaint against a supervisor, despite knowing about the complaint for longer). Therefore, Hu states a claim for retaliation based on her allegation that Defendants fired her for engaging in protected activity in 2017.

Accordingly, the court will grant in part and deny in part Defendants' motion to dismiss the retaliation claims under Title VII, § 1981, and the DCHRA (Counts IV, VI, & VII).

### 3. Hostile Work Environment Claim (Count III)

A plaintiff alleging hostile work environment claims must plead that the "workplace is permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993) (internal quotations and citations omitted). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Id.* at 21. Hostile work environment claims

are "usually characterized by a series of events that cumulatively give rise to a claim, although each individual component might not be actionable on its own." *Craig v. District of Columbia*, 881 F. Supp. 2d 26, 32 (D.D.C. 2012) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)). And "it must be clear that the hostile work environment was the result of discrimination based on a protected status." *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 56 (D.D.C. 2004). "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201 (citation omitted).

K4 contends that rather than alleging facts supporting a hostile work environment claim, Hu compiles instances where she disagreed with her supervisor that do not amount to objectively hostile conditions. (Def. Br. 18–22.) The court agrees. While Hu is a member of a protected class as a woman of Chinese descent, she fails to plausibly allege any other element of a hostile work environment. She claims that Johnson, her supervisor, told her she did not "belong here and should leave," stood behind her chair "frequently observing her stance and manner," "kept notes on her whereabouts and work," questioned CBP officers about her assignments, commented on her conversations and activities, "spied" on her emails, and gave her worse shifts and fewer hours. (Am. Compl. ¶¶ 24–25, 27–28.) Hu states that she reported Johnson's behavior to Duvall and Bethea, who "refused to listen" and told Hu that Johnson could monitor her because she was Hu's superior. (*Id.*) They did, however, instruct Hu to follow up with them if she experienced any retaliation. (*Id.* ¶ 31.) Hu claims that Johnson's behavior then escalated because she favored other employees. (*Id.* ¶¶ 27, 31–33.) She alleges that Johnson, had a "crush" on another employee, who she openly described as "handsome and attractive" and that

Johnson developed a "more than a professional relationship" with him. (*Id.*) As a result, Johnson gave him better shifts, more evaluation and guidance, and better work conditions, such as approving his schedule changes. (*Id.* ¶¶ 32–33.) Hu makes similar allegations against Duvall. (*Id.* ¶ 32.) Finally, she claims that Bethea and Duvall failed to stop Johnson's harassment after Hu reported it. (*Id.* ¶ 31.)

Taken together, the actions Hu complains of do not amount to conduct so severe or pervasive as to constitute a plausible hostile work environment claim. She does not allege there was "discriminatory intimidation, ridicule, and insult," so severe or so pervasive as to "alter the conditions of [] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66–67 (1986) (internal quotation and citation omitted). While her allegations reflect conflicts between Hu and her supervisors and managers, the alleged incidents show "[o]ccasional instances of less favorable treatment involving ordinary daily workplace decisions [which] are not sufficient to establish a hostile work environment." *Bell v. Gonzales*, 398 F. Supp. 2d 78, 92 (D.D.C. 2005) (citations omitted); *see also Franklin v. Potter*, 600 F. Supp. 2d 38, 77 (D.D.C. 2009) ("[T]he fact that an employee and his immediate supervisor repeatedly butted heads, that the supervisor frequently yelled at [the plaintiff] during discussions about . . . work, and that the supervisor threatened him with job-related consequences for his refusals to meet workplace expectations does not demonstrate a hostile work environment."). Moreover, Hu's factual allegations do not establish that the conduct was so "extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Hu alleges, in addition to Johnson's alleged harassment, that K4 paid her less than other employees who were white, male, or both; refused to promote her; created a false impression that

she would resign; and terminated her. (Am. Compl. ¶ 65.) But "discrete acts constituting discrimination or retaliation claims are different in kind from a hostile work environment claim." *Franklin*, 600 F. Supp. 2d at 77 (internal quotation omitted). By lumping these actions together, Hu "seeks to transform [her] challenges to discrete acts of alleged discrimination or retaliation (e.g., nonpromotions, denial of leave, and termination) into a hostile work environment claim by combining those events with a series of ordinary workplace difficulties." *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009). Even viewed in the light most favorable to Hu, the court finds that the conduct pleaded was not so pervasive or severe to amount to a hostile work environment.

Accordingly, the Court will grant K4's motion to dismiss the hostile work environment claim under Title VII (Count III).

### D. **Compensation Claims**

#### 1. Federal Equal Pay Act Claim (Count VIII)

Hu alleges K4 and RDTS violated the Equal Pay Act by failing to pay her the same as her male colleagues. (Am. Compl. ¶¶ 106–18.) To support this claim, Hu must allege facts indicating that: 1) she was "doing substantially equal work on the job, the performance of which required substantially equal skill, effort, and responsibility as the jobs held by members of the opposite sex;" 2) "the job was performed under similar working conditions;" and 3) she was "paid at a lower wage than members of the opposite sex." *Cornish v. District of Columbia*, 67 F. Supp. 3d 345, 359–60 (D.D.C. 2014).

Defendants argue that Hu has not pleaded that the employees who were paid more worked for the same employer. (Def. Br. at 25.) But as discussed above, the court has found that, at this stage, Hu has sufficiently pleaded that K4 and RDTS were joint employers.

Defendants also contend that Hu must allege she had the same job responsibilities, performed work substantially similar, or "exerted similar levels of effort in performing their jobs," as the similarly situated males who were paid more. (*Id.* at 26.) But this goes beyond what is required to survive a motion to dismiss. Hu pleads that she was paid less than her male colleagues when she "performed the same job with the same job title and description," and that their jobs "require equal skill, effort and responsibility under the same conditions." (Am. Compl. ¶¶ 107–08.) She also identifies a specific male employee who was paid significantly more and about whom she raised the disparate salary issue to K4. (*Id.* ¶¶ 109–10.) Because Hu claims she was paid less than her male colleagues for substantially equal work performed under similar working conditions, she has stated a claim for relief under the Equal Pay Act. *See Clay*, 128 F. Supp. 3d at 31; *Robinson*, 790 F. Supp. at 335.

Accordingly, the Court will deny Defendants' motion to dismiss the Equal Pay Act claim (Count VIII).

2. FLSA Claim (Count X)

The FLSA's overtime provision "ordinarily requires employers to pay employees time-and-one-half for hours worked beyond forty per week unless the employees are exempt." *Smith v. Gov't Emps. Ins. Co.*, 590 F.3d 886, 888 (D.C. Cir. 2010); *see* 29 U.S.C. § 207. Hu alleges that she worked twenty-seven hours on a weekend after working forty hours during the week and Defendants "failed to pay sufficient compensation for her overtime work." (Am. Compl. ¶¶ 133–35.).

Defendants argue that Hu must allege she "did not receive compensation" for her overtime work to state a claim. (Def. Br. at 31 (citing *Driscoll v. George Washington Univ.*, 42 F. Supp. 3d 52, 58 (D.D.C. 2012)).) Defendants' reliance on *Driscoll*, however, is misplaced.

*Driscoll* held that a plaintiff must plead that "defendant failed to pay [] overtime wages as required by law." *Driscoll*, 42 F. Supp. 3d at 58. This does not mean a plaintiff must receive no overtime wages to state a claim, but rather that she received wages that do not comply with the law. *See id.* Hu claims that she did not receive "sufficient" overtime compensation, which is enough to state a claim. Therefore, the court will deny Defendants' motion to dismiss the FLSA claim (Count X).

### 3. D.C. Leave Act Claim (Count XI)

Hu alleges that K4 and RDTS failed to provide sick leave in violation of the D.C. Leave Act, which prohibits an employer from interfering with or denying an employee's sick leave. D.C. Code §§ 32-531.02–.08. To plead a claim under the Act, a plaintiff must be eligible for and denied sick leave. *See Stephens v. Farmers Rest. Grp.*, 291 F. Supp. 3d 95, 118 (D.D.C. 2018).

Hu does not allege she was denied sick leave, but rather that the Defendants interfered with her leave by firing her the same day her approved medical leave began. (*See* Am. Compl. ¶¶ 43–44, 139–42.) When an employer terminates an employee after medical leave commences, and for reasons unrelated to the sick leave, the employer does not violate the D.C. Leave Act. *See, e.g.*, *Price v. Wash. Hosp. Ctr.*, 321 F. Supp. 2d 38, 47 (D.D.C. 2004) (finding no violation of the FMLA or the DCFMLA); *see also Throneberry v. McGehee Desha Cty. Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005) ("[A]n employer who interferes with an employee's FMLA rights will not be liable if the employer can prove it would have made the same decision had the employee not exercised the employee's FMLA rights."). Hu does not claim that the Defendants fired her for reasons related to her medical leave, but because she sent an "illegal" email complaining about the Defendants' allegedly discriminatory conduct. (Am. Compl. ¶¶ 40–42.)

Hu also claims that she was fired on March 18, 2017, "effective immediately" (*Id.* ¶ 42), but K4 reported her "departure date" to CBP as March 28, the day her sick leave was scheduled to end, and did not pay her for the ten days between March 18 and 28. (*Id.* ¶ 44.) This, Hu argues, amounted to interference with her sick leave. The court does not agree. Hu does not claim that Defendants did not pay her for the ten-day discrepancy because of anything to do with her sick leave, and therefore she does not state a claim under the D.C. Leave Act. *Cf. Price*, 321 F. Supp. 2d at 47. Therefore, the court will grant Defendants' motion to dismiss the D.C. Leave Act claim (Count XI).

**E. Defamation Claim (Count IX)[5]**

To state a defamation claim, a plaintiff must plead, "1) that [she] was the subject of a false and defamatory statement; (2) that the statement was published to a third party; (3) that publishing the statement was at least negligent; and (4) that the plaintiff suffered either actual or legal harm." *Farah v. Esquire Magazine*, 736 F.3d 528, 533–34 (D.C. Cir. 2013).

Defendants argue that Hu must plead defamation with "particularity" and plead the "exact language" of the defamatory statement. (Def. Br. at 28 (citing *Wiggins v. District Cablevision*, 853 F. Supp. 484, 494 (D.D.C. 1994); *Hoffman v. Hill and Knowlton, Inc.*, 777 F. Supp. 1003, 1005 (D.D.C. 1991)).) But the District of Columbia does not use a heightened pleading standard for defamation claims. *Oparaugo v. Watts*, 884 A.2d 63, 77 (D.C. 2005) (citing *Crowley v. North Am. Telecomms. Ass'n*, 691 A.2d 1169, 1172–73 (D.C.1997)). A

---

[5] RDTS belatedly raises in reply that Hu's defamation claims are untimely. A party cannot raise new arguments in a reply brief because it deprives the opposing party of the opportunity to respond. *See Performance Contracting, Inc. v. Rapid Response Const., Inc.*, 267 F.R.D. 422, 425 (D.D.C. 2010). Therefore, the court will not consider this argument in evaluating RDTS's motion to dismiss.

plaintiff need only allege facts that "permit the opposing party to form responsive pleadings," including the "language or substance of the claim for defamation." *Id.*

The court must also determine, as a threshold question, whether the allegedly defamatory statement is false. *Smith v. Clinton*, 253 F. Supp. 3d 222, 239–40 (D.D.C. 2017), *aff'd*, 886 F.3d 122 (D.C. Cir. 2018) (citing *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1091 (D.C. Cir. 2007), *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990)).

With these principles in mind, the court takes each of the six allegedly defamatory statements in turn.

1. <u>Statements about Termination for Sending an "Illegal" Email</u>

Hu claims that either Johnson or Yeh made two defamatory statements about the reason for her termination. (Am. Compl. ¶¶ 120(a)–(b), 123.) First, she alleges that one of them "published Plaintiffs' termination to all CSRs, managers, supervisors, and many CBP officers. Everyone who worked at Plaintiff's office at the EVUS Call Center[] knew from Defendants' announcement made in the office that Plaintiff had been terminated, and that the reason for her termination[] was because she sent 'illegal' emails to the EVUS team." (*Id.* ¶¶ 120(a), 123.) Second, she claims that one of them "made statements to individual CBP officers, including but not limited to Emila Bakopoulos, Kristofer Conteras, and Sarah Mattos, that Plaintiff was discharged for sending [an] 'illegal' email complaint." (*Id.* ¶¶ 120(b), 123.)

Neither of these statements is false, however, as Hu herself acknowledges that she was terminated for this very reason. (*Id.* ¶ 42.) Therefore, Hu cannot maintain a defamation claim with regard to these two statements.

2.  <u>Statement about Refusal to Return Badges</u>

According to Hu, either Johnson or Yeh "made statements to individual CBP officers and civilian employees, including but not limited to Luann Hooley, Monica Saad, Jason Ellis, Kristofer Conteras, and Sarah Mattos, that Plaintiff refused to turn in her CBP badges[.]" (*Id.* ¶¶ 120(c), 123.)  Defendants argue that Hu has not made out a claim for defamation because she has not pleaded "time, place, content, speaker, and listener of the alleged defamatory statement." (Def. Br. at 28 (citing *Wiggins*, 853 F. Supp. at 494).)  But, as noted above, the District of Columbia does not require particularity so long as the complaint provides the Defendants with sufficient notice.  *See Oparaugo*, 884 A.2d at 77.  Hu pleaded the "nature of the false and defamatory statement," *see id.*, by alleging that Johnson or Yeh told K4, RDTS, and CBP personnel that she "refused to turn in her CBP badges." (Am. Compl. ¶¶ 120(c), 123.)  Further, Hu identified the third party to whom the statement was made by detailing specific CBP officers and the fact that the statement was made to Call Center staff.  *Williams v. District of Columbia*, 9 A.3d 484, 492 (D.C. 2010) (finding the complaint sufficiently "identif[ied] by employment" the persons to whom the statement was allegedly made (internal quotation and citation omitted)).

Typically, a court must determine, as a threshold question, whether a plaintiff pleads statements that are capable of defamatory meaning, and whether the statement is either "actionable as a matter of law" or that it caused plaintiff "special harm."  *See Smith v. Clinton*, 253 F. Supp. 3d at 239–40.  And while Defendants argue generally that the alleged "defamatory statements are either true or non-actionable opinion," they make no specific arguments about whether the statement that Hu refused to return her badges is capable of defamatory meaning, is actionable as a matter of law, or caused special harm.  (*See* Def. Br. at 30.)  Therefore, the court

has no basis from which to determine whether the statement meets these threshold questions and will not make that determination here.

Because Hu identified the likely speaker, the general timeframe (after her termination), the third party to whom the statement was published, and the substance of the statement, she pleads enough for a defamation claim based on the statement alleged in Paragraph 120(c) of her Amended Complaint.

### 3. Statements about Termination to Potential Employers

Hu alleges that either Johnson or Yeh "reprinted" the statements about her firing and refusal to return her CBP badges "from late 2017 [until] today in several job interview sessions," when potential employers asked CBP officers "about the reason she left." (Am. Compl. ¶¶ 120(d), 123.) To state a defamation claim, a plaintiff must identify the third party to whom the statement was published. *Oparaugo*, 884 A.2d at 77. In *Oparaugo*, the D.C. Court of Appeals held that alleging publication to "various persons, both private and public, in Nigeria on various dates" did not sufficiently identify the third party. *Id.* Here too, Hu fails to properly identify the third party. Her vague allegation that the statement was made in "job interview sessions" provides Defendants with no information about the specific people or even category of people who received the information. Further, the inference that the third party is any employer with whom Hu applied for a job does not constitute a sufficiently identifiable category of people to put Defendants on notice. *See id.* Because Hu's allegations insufficiently identify the third party, she fails to plead that the alleged statement in Paragraph 120(d) of the Amended Complaint was defamatory.

4.  Statements by K4's Vice President, Matthew Vinciguerra

Finally, Hu alleges that K4's Vice President, Matthew Vinciguerra, made three defamatory statements about her.  (Am. Compl. ¶¶ 122, 124.)  First, he "stated in Defendant's management meetings and meetings with staffs [sic] that Plaintiff lied about Defendants' operations."  (*Id.* ¶ 122(a).)  Second, in these same meetings, he told people Hu had "caused a 'difficult' situation between Defendant and the Federal government."  (*Id.* ¶ 122(a).)  Third, he "informed individual staffs [sic] that because of Plaintiff's complaining, Defendants were facing a 'difficult' situation with the Agency."  (*Id.* ¶ 122(b).)

Defendants argue that Hu failed to allege both the third party to whom the statements were published and that, even if she had, the statements were not published to a third party because they were made within the company.  (Def. Br. at 30.)  Viewing the Amended Complaint in the light most favorable to Hu, the court finds that the statement avers that the recipients were Call Center staff, which is "sufficient to apprise [Defendants] of the person to whom the [statement] was published, at least by category."  *See Oparaugo*, 884 A.2d at 77.  Further, Hu sufficiently alleges that the statement was published because she alleges it was communicated to other staff at K4 who are "someone other than the person defamed."  *District of Columbia v. Thompson*, 570 A.2d 277, 292 (D.C. 1990), *vacated and remanded on reh'g*, 593 A.2d 621 (D.C. 1991) (citing Restatement (Second) Torts § 577(1)) (holding that dissemination within an employment group constitutes publication).[6]  Therefore, Hu sufficiently pleads publication and the third party to whom the statement was published at this stage of the proceeding.

_____

[6] While *Thompson* was vacated on rehearing on different grounds, it is instructive on the publication issue.

Defendants next contend that Vinciguerra's statements about Hu causing a "'difficult' situation" between Defendants and the agency are non-actionable opinions. (Def. Br. at 30.) To state a defamation claim, the statements at issue must be "verifiable" as false. *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 620 (D.C. Cir. 2001). "Accordingly, expressions of 'a subjective view, an interpretation, a theory, conjecture, or surmise' are not provably false and thus cannot undergird a claim of defamation." *Bauman v. Butowsky*, 377 F. Supp. 3d 1, 10–11 (D.D.C. 2019) (quoting *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 597 (D.C. 2000)). Expressions of opinion can be actionable only if they "imply a provably false fact, or rely upon stated facts that are provably false." *Guilford Transp. Indus., Inc.*, 760 A.2d at 597.

Here, Vinciguerra's statements about the "difficult situation" between the Defendants and CBP, (Am. Compl. ¶ 122(a)–(b)), which express a subjective opinion, do not fall within this exception. *See Clemmons v. Acad. for Educ. Dev.*, 70 F. Supp. 3d 282, 308–09 (D.D.C. 2014). In *Clemmons*, the court held that statements characterizing the plaintiff as "difficult" to work with and causing "management problems" were insufficient for a defamation claim because they expressed subjective opinion. *Id.* Likewise, Vinciguerra's statement that Hu caused a "difficult situation" between the Defendants and CBP expressed his subjective view of Hu's effect on the relationship between the two entities and is not verifiable as false. *See Armstrong v. Thompson*, 80 A.3d 177, 187–88 (D.C. 2013) (holding that statements suggesting the plaintiff had engaged in "serious integrity violations" and other "serious issues of misconduct" were unverifiable opinions). Therefore, Hu fails to state a defamation claim based on the allegations about the "difficult situation" in Paragraphs 122(a) and (b) of the Amended Complaint.

Hu also alleges that Vinciguerra defamed her by stating in management meetings that she "lied about Defendants' operations[.]" (Am. Compl. ¶ 122(a).) Defendants did not address the

veracity of this statement or whether it is capable of defamatory meaning, and the court therefore declines to reach those issues at this stage of the proceedings and will allow the defamation claim based on this allegation in Paragraph 122(a) to proceed.

Accordingly, the Court will grant in part and deny in part Defendants' motion to dismiss the defamation claim (Count IX).

## IV. CONCLUSION

For the reasons stated above, the court will DENY in part and GRANT in part Defendants' motion to dismiss. The court also will DENY RDTS's motion to dismiss.

A corresponding Order will issue separately.

Date: March 12, 2020

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge